UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

WHALEY ET AL.                                                                       PLAINTIFFS

v.                              No. 5:18-CV-05123

JIMMY ESEBAG and UNITED                                                             DEFENDANTS
LISCENSING GROUP, INC.

**OPINION AND ORDER**

Before the Court are Defendants Jimmy Esebag and United Licensing Group, Inc.'s ("Defendants") motion (Doc. 13) to dismiss for lack of personal jurisdiction or to abstain[1] and amended brief (Doc. 26) in support. Plaintiffs Justin Whaley, Rodney Redman, Ron Whaley, M. Sean Hatch, Michael Bahn, Jodie Daniels, and Tom Maddi ("Plaintiffs) filed a response (Doc. 28) in opposition with leave of Court. Defendants then filed a reply (Doc. 31) to the response. For the following reasons, Defendants' motion (Doc. 13) is GRANTED.

**I.  Background**

Plaintiffs assert causes of action for violations of the Securities Exchange Act, California Corporations Code, fraud, unjust enrichment, and unfair competition. (Doc. 14, p. 5). Plaintiffs, with the exception of Tom Maddi, are all Arkansas residents. (Doc. 8, p. 2). Mr. Maddi is an Illinois resident. (Doc. 8, p. 2). Plaintiffs are all affiliated with the Gyde Group, LLC, an Arkansas LLC headquartered in Arkansas that invests in merchandising and marketing opportunities. (Doc. 8, p. 3). Defendant Jimmy Esebag is a citizen of the state of California. (Doc. 8, p. 2). His company, United Licensing Group, Inc. ("ULG"), is a corporation organized under the laws of the state of California, with its principal place of business in Los Angeles, California.

---

[1] Defendants have withdrawn their alternative motion to abstain. (Doc. 31, p. 1).

1

(Doc. 8, p. 2; Doc. 28, p. 4). Plaintiffs Justin Whaley, Rodney Redman, Sean Hatch, Michael Bahn and Jodie Daniels first met with Mr. Esebag on January 25, 2017 to discuss a potential opportunity to market a product called Dr. Boost. (Doc. 8, p. 3). This meeting took place at Mr. Esebag's office in Los Angeles, California. (Doc. 28-1, p. 1). Plaintiffs allege that Mr. Esebag was very interested in working with them because of their connections with Walmart, headquartered in Bentonville, Arkansas. (Doc. 28-1, p. 1).[2] Mr. Esebag told Plaintiffs that once Dr. Boost was ready for market, he would invest $20 million of his own funds in a large-scale advertising campaign. (Doc. 8, p. 4). Mr. Esebag also shared with Plaintiffs that Dr. Boost was in the final stages of development and the product would be available for sale in June 2017. (Doc. 8, p. 4). Plaintiffs allege that Mr. Esebag's statements regarding the product were knowingly false and that they relied on those statements in making their investment in ULG. (Doc. 8, p. 4).

On January 31, 2017, Plaintiffs participated in a Skype call with Mr. Esebag further discussing the Dr. Boost opportunity. (Doc. 8, p. 4). Plaintiffs followed up this call with a second in-person meeting with Mr. Esebag regarding the product at his home in Los Angeles, California on February 27, 2017. (Doc. 8, p. 4). Following the February 2017 meeting, Mr. Esebag and Plaintiffs communicated by telephone, text message, and email regarding a potential partnership on the Dr. Boost venture. (Doc. 8, p. 4; Doc. 28, p. 3). As a result of these conversations, Plaintiffs and Defendants agreed that Plaintiffs would become a partner in the Dr. Boost venture by purchasing a minority interest in ULG. (Doc. 8, p. 4; Doc. 28, p. 4). On May 8, 2017, Plaintiffs again met with Mr. Esebag in California to discuss the purchase of a minority interest in ULG. (Doc. 8, p. 5). At this meeting Mr. Esebag and Plaintiffs Sean Hatch and Justin Whaley agreed

---

[2] At the first meeting in California, Defendants assert that Plaintiffs first raised the subject of acquiring an ownership interest in Dr. Boost. (Doc. 31, pp. 1-2; Doc. 28-2, p. 2).

upon a minority interest purchase price of $25 million dollars for a 25% interest in ULG, to be paid in installments detailed in the payment schedule. (Doc. 8, p. 5).

On May 10, 2017, Mr. Esebag emailed Plaintiffs the first draft of the Memorandum of Understanding ("MOU") memorializing the parties' agreement. (Doc. 8, p. 5). Over the course of the next several days, Defendants and Plaintiffs again exchanged emails and phone calls to negotiate the payment schedule. (Doc. 8, p. 5). On May 16, 2017, Plaintiffs wired Jimmy Esebag $2,500,000 from their Arkansas bank account. (Doc. 8, p. 5). Between May 16, 2017 and June 23, 2017, the parties exchanged emails and calls to attempt to finalize the terms of the MOU regarding the payment schedule. (Doc. 8, p. 6). Plaintiffs allege that Mr. Esebag falsely represented in these communications that the parties would renegotiate the deal if the Dr. Boost sales failed to support Plaintiffs' obligations to ULG. (Doc. 28, p. 5). The parties finalized the MOU on June 23, 2017. (Doc. 8, p. 6). The MOU is governed by California law. (Doc. 8, p. 7).

Plaintiffs allege that after the parties signed the MOU, Defendants' misrepresentations became apparent. (Doc. 8, p. 7). Plaintiffs assert that Defendants knew that Dr. Boost would not be ready until after June 2017 because Mr. Esebag did not select a manufacturer of the product until August 2017. (Doc. 8, p. 7). Mr. Esebag later informed Plaintiffs that he would not invest the promised $20 million for product marketing. (Doc. 8, p. 8). On July 5, 2017, Mr. Esebag met with Justin Whaley in Bentonville, Arkansas to discuss the state of Dr. Boost. (Doc. 28- 1, p. 4). Plaintiffs allege that Mr. Esebag did not adhere to the agreed upon payment schedule and traveled to Arkansas to personally demand payment at their Arkansas office. (Doc. 8, p. 9).

Because of continued disagreements between the parties, Mr. Esebag filed suit in Superior Court of the State of California, County of Los Angeles, alleging breach of contract against Justin Whaley, Rodney Redman, Ron Whaley, M. Sean Hatch, Michael Bahn, Jodie Daniels, and Tom

3

Maddi. (Doc. 14, p. 4). The Defendants filed a notice of removal in the United States District Court for the Central District of California. (Doc. 14, p. 5). However, this removal failed. (Doc. 14, p. 3).[3] After the California complaint was filed, Plaintiffs filed the instant action.

## II. Analysis

Whether the Court can exercise personal jurisdiction over Defendants requires an analysis of two issues: (1) whether the exercise of personal jurisdiction over Defendants is allowed under the forum state's long-arm statute; and (2) whether the exercise of personal jurisdiction over Defendants comports with due process. *Dakota Indus., Inc. v. Dakota Sportswear*, Inc., 946 F.2d 1384, 1387–88 (8th Cir. 1991). "Arkansas's long-arm statute provides for jurisdiction over persons and claims to the maximum extent permitted by constitutional due process." *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011) (citing Ark. Code Ann. § 16-4-101). The sole issue for analysis, then, is whether the Court can exercise personal jurisdiction over Defendants consistent with due process. Plaintiffs bear the burden of persuasion on this issue:

> When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists. To successfully survive a motion to dismiss challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant. A plaintiff's prima facie showing must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion. Where no hearing is held on the motion, we must view the evidence in a light most favorable to the plaintiff and resolve factual conflicts in the plaintiff's favor; however, the party seeking to establish the court's personal jurisdiction carries the burden of proof and that burden does not shift to the party challenging jurisdiction.

*Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations and quotations omitted). Because the Court is not holding a hearing on this motion, the evidence is viewed and

---

[3] It appears the removal was attempted under seal, and twice denied. *See Jimmy Esebag v. Rodney Redman, et al.*, 2:18-cv-05004 (C.D. Cal. June 7, 2018).

factual conflicts are resolved in Plaintiff's favor.

A court may exercise personal jurisdiction over an out-of-state defendant consistent with due process so long as the defendant has minimum contacts with the state such that maintaining the lawsuit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement*, 326 U.S. 310, 316 (1945). Where the defendant's contacts with the forum state are so systematic and continuous that the defendant can fairly be said to be "at home" in the state, then courts in that state may exercise personal jurisdiction over the defendant in any case or controversy. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). When the defendant's contacts are this substantial, a court is said to be exercising "general jurisdiction." *Id.* Where the defendant's contacts are too minimal for a court to exercise general jurisdiction, it may still exercise "specific jurisdiction" over those cases or controversies that arise out of or relate to the defendant's contacts with the forum (provided that exercising jurisdiction on the basis of those contacts does not offend traditional notions of fair play and substantial justice). *Daimler AG v. Bauman*, 571 U.S. 117, 126-28 (2014).

Plaintiffs do not argue that general jurisdiction is present in this case. Accordingly, the Court's analysis will focus on specific jurisdiction. Specific jurisdiction may be exercised over a person when a case or controversy arises out of that person's contacts with the forum. *Int'l Shoe*, 326 U.S. at 319 ("[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protections of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."). The Eighth Circuit has traditionally employed a five-factor test to determine whether the alleged contacts a defendant

has with a forum state are sufficient to exercise personal jurisdiction over the defendant comporting with due process. *Fastpath, Inc.*, 760 F.3d at 821. The Eighth Circuit analyzes "1) the nature and quality of contacts with the forum state; 2) the quantity of the contacts; 3) the relation of the cause of action to the contacts; 4) the interest of the forum state in providing a forum for its residents; and 5) convenience of the parties." *Id.* The first three factors are considered the most significant. *Id.* Indeed, Supreme Court decisions like *Bauman* and *Goodyear* clarify that the third factor is of primary importance. *Bauman*, 571 U.S. at 126-28 (explaining that specific jurisdiction is the adjudicatory authority in suits arising out of or relating to a defendant's contacts with the forum state); *Goodyear*, 564 U.S. at 923–24 (same). The Eighth Circuit test can be used by the Court to determine "whether the suit arises out of or is related to the Defendants' contacts with the forum and whether Defendants engaged in activities in the forum that reveal an intent to invoke or benefit from the protection of its laws." *Pangaea, Inc.*, 647 F.3d at 746. It is not mechanically applied. *Id.* at n.4.

Specific jurisdiction exists when a defendant purposefully directs its activities at the forum state, and the lawsuit "relates to" or "arises from" those activities. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010). The "'minimum contacts' analysis looks to the defendant[s'] contacts with the forum State itself, not the defendant[s'] contacts with persons who reside there." *Walden v. Fiore*, 134 S.Ct. 1115, 1122, (2014). "[T]he plaintiff cannot be the only link between the defendant and the forum." *Fastpath, Inc.*, 760 F.3d at 823 (quoting *Walden*, 571 U.S. at 1125). These "same principles apply when intentional torts are involved." *Walden*, 571 U.S. at 286 (2014). "The proper question is not where the plaintiff[s] experienced a particular injury or effect but whether the defendant[s'] conduct connects [the defendants] to the forum in a meaningful way." *Id.* at 290.

Thus, the Court must analyze the nature, quality, and quantity of Defendants' contacts to Arkansas and determine whether this lawsuit relates to or arises from those contacts. Mr. Esebag and ULG's contacts with Arkansas are few. Plaintiffs emphasize the calls, text messages and emails that were exchanged between Defendants and Plaintiffs. However, the Eighth Circuit has made clear that contacts "us[ing] . . . arteries of interstate mail, telephone, railway, and banking facilities [are] insufficient" to establish personal jurisdiction by themselves. *Mountaire Feeds, Inc. v. Agro Impex, S. A.*, 677 F.2d 651, 655 (8th Cir. 1982); *Digi–Tel Holdings, Inc. v. Proteq Telecomms. (PTE)*, Ltd., 89 F.3d 519, 523 (8th Cir. 1996). These communications were targeted at Plaintiffs, and not at Arkansas. *Walden*, 571 U.S. at 286 (2014). Thus, the continued communications between the parties fails to connect the Defendants to Arkansas in a meaningful way.

Plaintiffs also point to Defendant Jimmy Esebag's travel to Arkansas on two different occasions, one for purposes related to the contract between the parties, one on account of the relationship between the parties. These travels are, at least, contacts with Arkansas. However, the lawsuit does not arise from or relate to that travel. The Securities Exchange Act violations, California Corporations Code violations, facts allegedly constituting fraud, unjust enrichment, and unfair competition all occurred in California, or at best in interstate communications targeted at Plaintiffs, who received them in Arkansas.

Plaintiffs traveled to meet with Mr. Esebag three times in California prior to signing the final MOU. (Doc. 31, p. 2-3). It was in the first face-to-face meeting in California that Plaintiffs allege that Mr. Esebag pitched his scheme to defraud Plaintiffs. (Doc. 28, p. 1-2). Further, Plaintiffs allege that Mr. Esebag did not properly register the ULG shares under federal or California law, while acting on behalf of ULG, a California company. (Doc. 8, p. 1). These omissions occurred

7

in California. Mr. Esebag's trips to Arkansas are incidental to the alleged wrongful conduct. Mr. Esebag's first trip to Arkansas was simply to discuss the state of Dr. Boost with Plaintiffs. (Doc. 28, p. 5). Mr. Esebag's second trip to Arkansas was to demand payment as required under the MOU. (Doc. 28, p. 6). Even if Mr. Esebag's demand for payment was in breach[4] of the MOU signed by the parties, this breach of contract action would be governed by California law, under the MOU's choice of law provision. (Doc. 8, p. 7).

Finally, Plaintiffs imply that Mr. Esebag targeted Plaintiffs with his scheme because they had experience marketing products to Walmart, headquartered in Arkansas. Plaintiffs attempt to use these Walmart connections as evidence that Defendants were connecting with Arkansas in a meaningful way by doing business with the Plaintiffs. However, the exhibits that Plaintiffs provide only demonstrate that Plaintiffs were reaching out to contacts they had at Walmart to pitch Dr. Boost to Walmart buyers. (Doc. 28-1, p. 8-9). There is no evidence provided that Mr. Esebag was only targeting investors in the state of Arkansas. Mr. Esebag could have used any firm with connections to Walmart buyers to do the same job, regardless of whether that firm was located in Arkansas or not. Accordingly, this evidence alone does not establish that the Defendants were directing their conduct at Arkansas. Rather, the evidence demonstrates that they were directing their conduct at Plaintiffs.

The final two factors in the specific jurisdiction analysis appear to be neutral for the parties. Although Arkansas does have an interest in providing a forum for its residents, California has an equal in interest in providing such a forum. Furthermore, although all Plaintiffs aside from Mr. Maddi reside in Arkansas, both Mr. Esebag and ULG are California citizens. Plaintiffs offer no

---

[4] Plaintiffs argue that Mr. Esebag's payment demand in Arkansas was a breach of the MOU signed by the parties.

evidence that suggests that specific evidence or witnesses are present in Arkansas that would make Arkansas the appropriate forum. It would be equally convenient to hold the trial in California as it would to hold it in Arkansas.

Specific jurisdiction over Defendants is absent in this case. California appears to be the appropriate forum for this action.

**III.     Conclusion**

IT IS THEREFORE ORDERED that Defendants Jimmy Esebag and United Licensing Group, LLC's motion (Doc. 13) to dismiss for lack of personal jurisdiction is GRANTED, and this case is DISMISSED WITHOUT PREJUDICE. Judgment will be entered separately.

IT IS SO ORDERED this 10th day of October, 2018.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE